IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| FAILAUTUSI MOEVAO, | ) | No. C 05-2125 CW (PR) |
| | ) | |
| Petitioner, | ) | ORDER DENYING PETITION |
| | ) | FOR A WRIT OF HABEAS |
| v. | ) | CORPUS |
| | ) | |
| BEN CURRY, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

INTRODUCTION

Petitioner Failautusi Moevao, a prisoner of the State of California who is incarcerated at the California Training Facility in Soledad, filed this <u>pro se</u> petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  The Court ordered Respondent to show cause why the petition should not be granted.  Respondent has filed an answer along with a supporting memorandum and exhibits. Petitioner has filed a traverse.

For the reasons outlined below, the Court DENIES the petition for a writ of habeas corpus on all claims.

PROCEDURAL HISTORY

On November 9, 2000, a jury in San Francisco County Superior

---

[1]For simplicity, the first amended petition filed on August 8, 2006, is referred to herein as the "petition."

**United States District Court**
For the Northern District of California

Court found Petitioner guilty of second-degree murder, torture, and sexual penetration with a foreign object. (Resp't. Ex. A (Clerk's Transcript) (CT) at 1249.) Great bodily injury was alleged in connection with both the torture and the sexual penetration charges; the jury found the allegation true as to the torture charge, but not true as to the sexual penetration charge. (Id.) The trial court had previously dismissed a robbery charge and a "hate-crime" allegation. (Id. at 395, 1002.)

On January 19, 2001, the trial court sentenced Petitioner to a term of twenty-one years to life in state prison, consisting of a term of fifteen years to life for second-degree murder, consecutive to a term of six years for sexual penetration. (Id. at 1272.) The trial court stayed the sentence on the torture conviction, and struck the jury finding of great bodily injury as to that charge. (Id. at 1262, 1272.)

On July 3, 2003, the California Court of Appeal affirmed the convictions and sentence in an unpublished opinion. (Resp't. Ex. C.) On October 29, 2003, the California Supreme Court summarily denied the petition for review. (Resp't. Ex. D.) On December 8, 2004, Petitioner filed a petition for a writ of habeas corpus in the California Supreme Court, and it was summarily denied on November 2, 2005. (Resp't. Ex. E.)

Petitioner filed the original petition in this matter on May 24, 2005. On August 8, 2006, after the California Supreme Court had denied his petition, Petitioner filed a first amended petition setting forth the following nine claims: (1) that the instruction on voluntary manslaughter violated his constitutional rights; (2) that prosecutorial comments during rebuttal argument violated

2

his right to due process; (3) that counsel was ineffective in failing to object to the prosecutor's comments during rebuttal argument; (4) that trial and appellate counsel were both ineffective in failing to challenge the sufficiency of the evidence of torture; (5) that the instruction on involuntary manslaughter violated his constitutional rights; (6) that counsel was ineffective in failing to object to the involuntary manslaughter instruction; (7) that counsel was ineffective in failing to object to the jury instructions regarding vicarious liability; (8) that the instructions regarding vicarious liability violated his constitutional rights; and (9) that the cumulative effects of the errors asserted in claims three through eight violated his constitutional rights.

On December 17, 2007, the Court ordered Respondent to show cause why the petition should not be granted. On August 4, 2008, Respondent filed an answer along with a supporting memorandum and exhibits. On November 13, 2008, Petitioner filed a traverse.

STATEMENT OF FACTS

In its written opinion, the California Court of Appeal summarized the factual background as follows:

> Seth Woods was 20 years old and mentally slow. Muscular and heavyset, he stood just over five feet tall. He lived with his foster mother in San Francisco. On December 20, 1995, Woods spent the day with his sister at the Sunnydale housing project. At 10:45 p.m., Woods telephoned his foster mother and left for home.
>
> At the edge of the project is an area where people congregate. Called the "gate," it is comprised of a fence atop a concrete embankment. The embankment, approximately 30 feet high, overlooks Velasco street, where Woods customarily caught the bus to return home. Instead of getting on the bus that night, Woods went to the gate. There he encountered 15-year-old Francis T., who knew Woods from the neighborhood; 11-year-old Faafoiuna T.,

United States District Court
For the Northern District of California

known as Ina; Logovii I., who was approximately 15 years old; Sandy T., also a juvenile, and defendant, whose 16th birthday was the next day. The young men were drinking malt liquor. Woods appeared to have been drinking and accepted their offer of beer.

Shortly after Woods arrived, defendant and Ina left to go to the store. Woods and Logovii started fighting. Wrestling with each other, they fell through a hole in the cyclone fence and slid down the embankment to the street below. Logovii walked back up the hill, and Woods followed shortly thereafter. Neither appeared hurt. After defendant and Ina returned, Logovii attacked Woods again, hitting him and grabbing his jacket as both fell down the embankment a second time. Francis and the others ran to them. Francis, Sandy and Logovii told Woods to go home. When he did not comply, Logovii and Sandy hit him. When Woods stumbled, Logovii grabbed him from behind and dragged him down the street. Sandy struck Woods several times. Woods, flailing and swinging his arms, hit defendant who was standing nearby. Ina [FN] testified that at Sandy's direction he searched through Woods' pockets and Woods' pants fell down during the process. Logovii released Woods, who fell to the ground and no longer fought back. Ina testified that defendant then kicked Woods in the head. Ina was impeached with his statement to the police in which he described defendant's actions as "stomping." Francis testified that defendant kicked Woods two to four times, but denied that defendant stomped the victim. Francis was impeached with his statement to the police that defendant stomped Woods three or four times. Ina testified that he, Logovii and Sandy also hit and kicked Woods who was motionless. Francis pulled Sandy and Logovii off Woods and told the group to stop.

[FN:] Ina testified under a grant of use immunity.

Ina testified that someone then picked up a thin foot-long stick. Sandy slapped Woods with the stick and then gave it to Ina. Ina jabbed Woods with the stick "in his butt." Ina testified that he could not remember if defendant touched the stick. Ina was impeached with his statement to the police stating that defendant put the stick in Woods' anus and that he (Ina) never did so. Ina took Woods' shoes and the group left.

Police later found Woods lying face down, his pants below his knees, bleeding from his face, ears and buttocks. Woods was transported to the hospital where tests showed him to be functionally brain dead. Woods' blood alcohol level at the time of admission was around .22. There were abrasions on the side of his face and air in the tissue of his ear, suggesting repeated trauma. According to the examining physician, the injuries were consistent with

having been repeatedly kicked or stomped on the left side of the head near the ear. The medical examiner opined that "diffuse axonal" or "shear" brain injury caused Woods' death. He concluded that the injuries to Woods' head were consistent with kicking or stomping and were the result of multiple blows. Additionally, Woods' anus was lacerated. With no chance of renewed brain function, Woods' life support system was withdrawn and he died two days later.

Defendant was arrested and gave a videotaped interview. Inspector James Bergstrom, who conducted the interview, later discovered that the audio portion failed to record. Bergstrom testified that defendant admitted stomping Woods in the head. Defendant also admitted putting a stick in Woods' anus while saying, "This is for my birthday" and "This is for the Samoans." After discovering the audio failure, Inspector Bergstrom conducted another videotaped interview.

The second videotaped interview was played for the jury. Defendant admitted the following: He hit and kicked Woods at the bottom of the embankment. When Woods was striking out at the others, he accidentally hit defendant. After Woods was on the ground, defendant did most of the kicking. When asked to clarify whether he was kicking or stomping, defendant said, "No, I'm stomping." During the course of the dragging, Woods' pants fell down. Defendant picked up a piece of metal, put it in Woods' anus and twisted it once. Defendant smoked marijuana on the night of the assault, but denied drinking.

Following his second interview, defendant was left alone in the interview room while the video recorder continued to run. Defendant made several phone calls during which he admitted kicking Woods in the head. He stated, "They had everything on me, somebody told everything." He also made a threat to "kill that motherfucker ... that ratted on me." He compared himself to someone who killed and robbed and said, "All I did was just kill[ ] the man." In a telephone call to his mother, defendant said, "That's all I did ... kicked him ... on his head," and "They said everything is on me, 'cause I did most of it."

Police seized the shoes defendant wore during the assault. They bore traces of blood which, based on genetic testing, were matched to Woods, who was an African-American. The likelihood that another African-American male would have this same genetic profile was one in 264 million.

Defendant testified. On the day of the murder, he bought alcohol and spent the afternoon drinking and smoking marijuana at the Double Rock projects. Around 6 or 7:00 p.m., he purchased more liquor and continued to drink and

United States District Court
For the Northern District of California

smoke marijuana until 9 or 10 p.m. During this time he took three "dance" pills, which made him feel "kind of amped." Defendant and his cousin took a bus to the Sunnydale projects, where defendant bought a 40-ounce bottle of malt liquor and went to the gate. Francis, a school friend, was there, along with Sandy, Logovii and Ina, whom defendant knew less well. Defendant drank with the group for about 10 or 15 minutes. Defendant's cousin left and the group walked with him to the bus stop. Afterwards, they bought more malt liquor and returned to the gate.

A short time later, defendant and Ina left to buy marijuana. Woods, whom defendant had never seen before, was there when defendant and Ina returned. Woods' clothing was dirty and he had grass in his hair. He looked angry and was talking to Francis. Sandy told Ina that something had happened while defendant and Ina were gone. Logovii started arguing with Woods and tried to "jump on" him, but Francis pushed Logovii away. Logovii grabbed Woods' shirt, threw him against the fence and punched him. Woods fell through an opening in the fence and down the embankment. Logovii, Sandy, Ina and Francis ran down after him. From the top of the embankment, defendant heard the others yelling at Woods to go home. Defendant then joined the group.

Logovii hit Woods. Woods swung in response and hit defendant. Woods' blow left no mark. Defendant, not realizing Woods hit him accidentally, reacted by hitting Woods in the face. Defendant testified that Woods' blow made him angry and afraid and that he did not know what Woods "was capable of doing," nor did he know why Woods and Logovii were fighting.

Logovii grabbed Woods and dragged him down the street while Sandy punched Woods in the face and Ina kicked him in the legs. Logovii released Woods and he fell to his knees. Defendant testified that at that point everyone except Francis attacked Woods. Defendant admitted that he stomped Woods three or four times in the head because he was angry. He knew that he was hurting Woods and that Woods could not defend himself. Defendant claimed that although he was angry with Woods, he did not intend to kill him.

Francis made defendant stop his assault. Then, however, defendant picked up a curved chrome stick. He hit Woods' exposed buttocks, but denied putting the stick in Woods' anus. He threw the stick away and ran from the area with Francis. Logovii, Sandy and Ina joined them about five or ten minutes later.

Defendant said he did not learn of Woods' death until his arrest on December 30, 1995. He stated that in the first

United States District Court
For the Northern District of California

interview he told the officer that he hit Woods on the
buttocks with the stick. However in the second interview,
he went along with whatever the officer asked because he
was tired of being questioned. In the telephone calls
with his friends, he said he acted cocky because he did
not want others to know that he was scared. His comment
to his mother that "everything is on me 'cause I did most
of it," was not an admission, but an explanation of the
accusation against him.

The jury convicted defendant of second-degree murder,
torture and sexual penetration with a foreign object.
They found true the great bodily injury allegation
attendant to torture, but not to sexual penetration. The
court struck the great bodily injury finding and
sentenced defendant to 15 years to life in state prison
for second degree murder and imposed a consecutive
sentence of six years for sexual penetration, for a total
prison term of 21 years to life. Sentencing on the
torture conviction was stayed pursuant to Penal Code
section 654.

(Resp't. Ex. C at 1-4 (footnote in original).)

LEGAL STANDARD

A federal court may entertain a habeas petition from a state

prisoner "only on the ground that he is in custody in violation of

the Constitution or laws or treaties of the United States."  28

U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death

Penalty Act (AEDPA), a district court may not grant a petition

challenging a state conviction or sentence on the basis of a claim

that was reviewed on the merits in state court unless the state

court's adjudication of the claim: "(1) resulted in a decision that

was contrary to, or involved an unreasonable application of,

clearly established federal law, as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based

on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."  28 U.S.C.

§ 2254(d).

A decision is contrary to clearly established federal law if

7

it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result.  Clark v. Murphy, 331 F.3d 1062, 1067 (9th. Cir. 2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  The reasonableness inquiry under the "unreasonable application" clause is objective.  Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is the holdings of the Supreme Court as of the time of the relevant state court decision.  Id. at 412.

Even if the state court's ruling is contrary to or an unreasonable application of Supreme Court precedent, that error justifies habeas relief only if the error resulted in "actual prejudice."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

To determine whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established law, a federal court looks to the decision of the highest state court that addressed the merits of a petitioner's claim in a reasoned decision.  LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th

United States District Court
For the Northern District of California

Cir. 2000).  When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the Court looks to the last reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).

Petitioner's first two claims in his amended petition -- that the voluntary manslaughter instruction was in error and that the prosecutor committed misconduct in his rebuttal argument -- were raised on direct appeal.  The last explained decision to address these claims was by the California Court of Appeal, and consequently, under Ylst, that is the state court decision that is reviewed under 28 U.S.C. § 2254(d)(1).

Petitioner's remaining seven claims were raised in the state court in a habeas petition, and were summarily denied.  In such a case, where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable.  Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006).  When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law.  Id. at 1198.  "[W]hile we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." Fisher v. Roe, 263 F.3d 906, 914 (9th Cir. 2001).  Accordingly, the

9

**United States District Court**
For the Northern District of California

1 Court reviews Petitioner's third through ninth claims pursuant to

2 <u>Plascencia</u> and <u>Fisher</u>.

3                              DISCUSSION

4 I.   VOLUNTARY MANSLAUGHTER JURY INSTRUCTION

5        In his first claim, Petitioner contends that the instruction

6 on voluntary manslaughter improperly informed the jury that

7 voluntary manslaughter required an intent to kill.  (Amend. Pet. at

8 9 (citing <u>People v. Lasko</u>, 23 Cal. 4th 101 (2000).  Petitioner

9 argues that this error created a false choice for the jury between

10 second-degree murder, involuntary manslaughter or acquittal, and,

11 not wanting to acquit or find involuntary manslaughter, the jury

12 wrongly convicted Petitioner of second-degree murder.  As a result,

13 Petitioner claims, the erroneous voluntary manslaughter instruction

14 violated his constitutional rights to due process, to equal

15 protection, to present a defense and to the effective assistance of

16 counsel.  (Amend. Pet. at 9.)

17        The voluntary manslaughter instruction was issued pursuant to

18 CALJIC No. 8.40, and read as follows:

19        Every person who unlawfully kills another human being
          without malice aforethought but with an intent to kill,
20        is guilty of manslaughter in violation of Penal Code
          Section 192(a).  There is no malice aforethought if the
21        killing occurred upon a sudden quarrel or a heat of
          passion or in the actual but unreasonable belief in the
22        necessity to defend oneself against imminent peril to
          life or great bodily injury.  In order to prove this
23        crime, that is the crime of voluntary manslaughter, each
          of the following elements must be proved:
24             1. A human being was killed;
               2. The killing was unlawful; and
25             3. The killing was done with the intent to kill.
          A killing is unlawful, if it was not justifiable nor
26        excusable.

27 (CT at 1199.)

28        To obtain federal collateral relief for errors in the jury

charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See Estelle v. McGuire, 502 U.S. 62, 72 (1991).  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  See id.  In reviewing a faulty instruction, the court inquires whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution.  Id. at 72, n.4.  A jury instruction that omits or misdescribes an element of an offense is constitutional error subject to prejudice analysis on a federal habeas petition.  Evanchyk v. Stewart, 340 F.3d 933, 940 (9th Cir. 2003).  The error is prejudicial if it had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The California Court of Appeal found that the challenged instruction was erroneous under Lasko, but it did not reverse the conviction because it concluded that the error did not cause prejudice.  (Resp't. Ex. C at 6-8.)  The Court of Appeal's prejudice analysis was as follows:

> The court fully and correctly instructed on the elements of first and second degree murder, heat of passion, perfect and imperfect self defense. It clearly stressed the distinction between murder and manslaughter, noting that murder requires malice, either express or implied, while manslaughter does not. (CALJIC Nos. 8.00, 8.10, 8.11. 8.37, 8.40, 8 .50.)

> The jury was given CALJIC No. 8.50 which informed them that, "[t]o establish that a killing is murder and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done in the heat of passion or upon a sudden quarrel...." This instruction informed the jury that, regardless of whether

11

the killing was intentional, the killing could not be murder if the prosecution did not disprove heat of passion or sudden quarrel. (Lasko, supra, 23 Cal.4th at p. 112.). By convicting defendant of murder, the jury necessarily found that defendant did not kill in the heat of passion or upon a sudden quarrel. Having made that finding, the jury could not have rendered a manslaughter verdict.

We agree with defendant that the evidence in this case supporting an intent to kill does not rise to the level of that in Lasko. However, the jury was instructed on involuntary manslaughter. Had the jury concluded the stomping was the result of heat of passion or a sudden quarrel, it could have convicted defendant of involuntary manslaughter. Defendant disagrees. He argues that the implied malice mental state is more culpable than the mere lack of "due caution and circumspection" required for involuntary manslaughter. (CALJIC No. 8.45.) Defendant misses the import of the Supreme Court's analysis of CALJIC No. 8.50: "Had the jury believed that defendant unintentionally killed Fitzpatrick in the heat of passion, it would have concluded that it could not convict defendant of murder (because he killed in the heat of passion) and could not convict defendant of voluntary manslaughter (because he lacked the intent to kill). The jury most likely would have convicted defendant of involuntary manslaughter...." (Lasko, supra, 23 Cal.4th at p. 112.)

Based upon our review of the record, we conclude the murder verdict in this case is not attributable to instructional error, but to the weakness of the evidence on heat of passion. Heat of passion is equivalent to provocation, which must be caused by the victim. The conduct must be sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (People v. Lee (1999) 20 Cal.4th 47, 59.) "The test of adequate provocation is an objective one, however. The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment." (Id. at p. 60.)

Considering the evidence in the light most favorable to the defendant with regard to the heat of passion defense, his own statements establish the following. Defendant was not involved or even present during the initial assault of Woods. After defendant's arrival on the scene, Woods, trying to defend himself, swung and flailed his arms. While doing so he struck defendant who was standing nearby. The blow did not knock defendant off his feet, or leave any mark. Defendant reacted by hitting Woods. According to defendant, Logovii then grabbed Woods and dragged him a short distance before dropping him on the

United States District Court
For the Northern District of California

ground. Defendant approached and, knowing Woods was defenseless, stomped him on the head at least three or four times. Nothing in the evidence suggests that defendant acted in the heat of passion when he committed this act. The jury was instructed: "The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances." Accepting defendant's explanation for his conduct, ample evidence supports the jury's finding that no ordinarily reasonable person would have been so inflamed by Woods' flailing strike as to lose all reason and judgment.

Based on all these considerations, it is not reasonably probable that a jury instructed on voluntary manslaughter without the intent to kill element would have convicted defendant of that offense. The error in giving the jury the former version of CALJIC No. 8.40 was harmless.

(Id. at 7-8.)

Thus, the state court found that there was no reasonable probability that the error affected the verdict. Where, as here, the state court on direct review found that an error was not prejudicial, a federal habeas court considering the "unreasonable application" clause of § 2254(d)(1) must first determine whether the state court's prejudice analysis was objectively reasonable. Medina v. Hornung, 386 F.3d 872, 878 (9th Cir. 2004). If it was, the petitioner is not entitled to habeas relief. If the prejudice analysis was objectively unreasonable, the federal habeas court then proceeds to decide whether the error was prejudicial under Brecht. See id. at 877.

The California Court of Appeal's prejudice analysis was objectively reasonable. In addition to the incorrect voluntary manslaughter instruction, the instructions also gave the jury the options of first-degree murder, second-degree murder, and involuntary manslaughter. (CT at 1193-1204.) The jury was instructed, pursuant to CALJIC No. 8.50, that murder requires

13

United States District Court
For the Northern District of California

malice, but manslaughter does not.  (CT at 1209.)  Further, the voluntary manslaughter instruction explained that malice is negated where the killing is done in the heat of passion or upon a sudden quarrel, or in unreasonable self-defense.  (CT at 1199.)  See Weeks v. Angelone, 528 U.S. 225, 234 (2000) (holding that juries are presumed to follow instructions).  Because second-degree murder requires malice, the California Court of Appeal reasonably found that the verdict of second-degree murder meant that the jury found malice.  Because the jury found malice, it rejected the defense theory that malice was negated by either heat of passion or unreasonable self-defense, and thus the jury could not and would not have found Petitioner guilty merely of voluntary manslaughter even under a correct voluntary manslaughter instruction.

The state court was also reasonable in finding that the jury was very unlikely to find voluntary manslaughter because the evidence of heat of passion or unreasonable self-defense was weak. At most, Woods struck Petitioner once while flailing his arms at the surrounding assailants, with a blow that was not sufficient to knock Petitioner backwards or leave a mark.  Woods had been dragged away and taken to the ground, and he was surrounded by five assailants and lying motionless on the ground when Petitioner repeatedly stomped on his head.  Based upon this evidence, the jury was unlikely to find that Woods's single, flailing blow either would inflame an ordinarily reasonable person to the point of killing, or caused Petitioner to believe that he had to act in self-defense.

Under these circumstances, the California Court of Appeal did not err in finding no reasonable probability that the instructional

14

United States District Court
For the Northern District of California

error affected the verdict.  These same circumstances also indicate that the instructional error did not have a substantial and injurious effect on the verdict so as to pass muster under the Brecht standard.

Petitioner also argues that the error in the voluntary manslaughter instruction violated his rights to equal protection, to present a defense, and to effective assistance of counsel.[2] Because the instructional error was not prejudicial under Brecht, it was not "prejudicial" within the meaning of Strickland v. Washington, 466 U.S. 668, 687-94 (1984) (holding that claim of ineffective assistance of counsel requires showing of prejudice from counsel's deficient performance).  These arguments fail.

For the reasons discussed, the state court's denial of Petitioner's claim based on the voluntary manslaughter instruction was neither contrary to nor an unreasonable application of federal law.  Petitioner is not entitled to habeas relief on this claim.

II.  PROSECUTORIAL MISCONDUCT DURING REBUTTAL ARGUMENT

In his second claim, Petitioner asserts that his right to due process was violated by improper prosecutorial comments during rebuttal argument.  (Amend. Pet. at 12.)  On rebuttal, in response to argument by defense counsel, the prosecutor compared the crimes in this case to three famous hate-crimes.  The California Court of Appeal summarized the relevant trial court proceedings as follows:

> In his closing argument, defense counsel argued: "[W]hat happened to Seth Woods is never going to change. So the intent in which [defendant] acted is the whole case. And

---

[2]These grounds were not raised in the California Court of Appeal, and thus were not addressed in that court's opinion.  They were raised in the petition for review to the California Supreme Court, which was summarily denied.

we can stand here and talk about how horrible the injuries were, etc. I am not denigrating that. I understand why that's important. Probably not in the context of this jury trial, but it's important in a human sense, but that's never [g]oing to change. The issue is the intent." He argued further, "Now, I told you at the outset that this is a senseless thing.... There has [been nothing] proven to you as to why Seth Woods died that night, why he was killed, nothing ." In discussing murder by torture, defense counsel argued: "Well, what is the sadistic purpose? ... I mean someone who takes pleasure out of causing pain and suffering to another. There is no reference to that. There is not a shred of evidence that [defendant] enjoyed or was doing it for some type of personal vendetta. There is nothing to support that."

In rebuttal argument, the prosecutor responded: "[Defense counsel] at some point said you know, he's dead and the injuries aren't relevant to this trial or to the issues. I beg to differ. Every wound you see there is evidence of intent, every single wound. And if you start at the last wound and what they did to Seth Woods's rectum, I ask if you have any question in your mind about whether or not they tried to inflict great pain on this man. They should have just killed him and put him out of his misery instead of torturing him like this, like an animal, like you wouldn't treat a dog. [¶] And so I ask why? I said there was no good reason for this but there are human reasons, things you can understand because people are cruel and brutal sometimes.... Who hasn't heard of the story out of Texas of ... dragging a man to his death? What is this about? They are just trying to kill a man when they do that or something more? ... Who hasn't heard a story like in New York where they had someone in custody and they put a plunger up his rectum. Why? What is this in the human heart that allows this? And this is ... what you have to wrestle with. This wasn't done just to kill this man, it was something more." The prosecutor continued, "And what are all those cases about? Someone doing something awful to a human being, unimaginable because they enjoy it in some way.... And that's what sadism is: enjoying in some sick way the suffering of a human being." He stated further: "People pick on people ... because they are little, because they are black, because they are gay. They string a young man to a ... fence in Wyoming and let him die in the cold of night because they want to hurt him." At that point defense counsel objected to the prosecutor's remarks as improper argument and the court sustained the objection.

(Resp't Ex. C at 9-10.)

A defendant's due process rights are violated when a misconduct by the prosecutor renders a trial "fundamentally

United States District Court
For the Northern District of California

1  unfair."  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  Under

2  Darden, the first issue is whether the prosecutor's remarks were

3  improper; if so, the next question is whether such conduct infected

4  the trial with unfairness.  Tan v. Runnels, 413 F.3d 1101, 1112

5  (9th Cir. 2005).  A prosecutorial misconduct claim is decided "'on

6  the merits, examining the entire proceedings to determine whether

7  the prosecutor's remarks so infected the trial with unfairness as

8  to make the resulting conviction a denial of due process.'"

9  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).

10      The California Court of Appeal found that the prosecutor's

11  remarks were proper based on the following analysis:

> In People v. Jones (1997) 15 Cal.4th 119, reversed on
> other grounds in Hill, supra, 17 Cal.4th at page 823,
> footnote one, the prosecutor made references to Adolph
> Hitler, Charles Manson and "Sacramento Vampire Killer"
> Richard Chase to argue that a killer is not necessarily
> guilty by reason of insanity because a murder was
> committed for irrational reasons. (Jones, supra, 15
> Cal.4th at p. 179.) The Supreme Court held that the
> prosecutor's references to these notorious figures did
> not constitute misconduct. The court stated: "'In
> general, prosecutors should refrain from comparing
> defendants to historic or fictional villains, especially
> where the comparisons are wholly inappropriate or
> unlinked to the evidence. [Citation.]' [Citation.] In the
> present case, it was proper for the prosecutor to use
> these well-known examples of irrational murders to
> illustrate his point regarding the limits of the defense
> of insanity." (Id. at p. 180.)
>
> Here, by referring to certain notorious crimes, the
> prosecutor was not comparing defendant's conduct to the
> perpetrators of those offenses. Defendant was charged
> with murder and torture. Defense counsel argued that
> torture had not been proven because the prosecution did
> not show a sadistic purpose in the killing. Defense
> counsel also asserted that the senseless nature of
> defendant's conduct offered no evidence of motive. In
> response, the prosecutor argued that it was precisely the
> killing's senseless nature, done for no apparent reason
> other than to hurt and humiliate the victim, that
> rendered it sadistic. The prosecutor used the Texas, New
> York and Wyoming incidents to illustrate his point that
> people can be "cruel and brutal" and enjoy "in some sick

17

way the suffering of a human being." In this context the prosecutor's remarks were not improper. A prosecutor's argument need not be stripped of legitimate emotional impact: "Many cases are sordid, mordant tales and their very description are librettos for threnodies of death and loss. To tell their story is to inevitably touch human emotions, because they are about human things: sad, terrible, alien human things. They cannot be left undescribed because they are terrible or alien to ordinary human standards of conduct. They are the issue in question and unless one transcends the evidential terms or deliberately calculates to do what the evidence does not support, they must be told and whatever human emotions they may awake are inescapable in the context of the truth of the occasion." (<u>Com. v. Strong</u> (Pa. 1989) 563 A.2d 479, 484.)

(Resp't. Ex. C at 10-11.)

The California Court of Appeal reasonably found that the prosecutor's comments were proper, particularly when they are considered in the context of the trial as a whole. A prosecutor's comments are analyzed in light of the defense argument that preceded them. <u>See</u> <u>United State v. Young</u>, 470 U.S. 1, 12-13 (1985); <u>Darden</u>, 477 U.S. at 179. One of the elements of the torture charge is that the defendant acted with a "sadistic purpose." Cal. Pen. Code § 206. In closing argument, defense counsel attacked the prosecution's case on the torture charge for not including "a shred of evidence" of a sadistic purpose, and for showing "nothing" about Petitioner's motive for the killing. (Resp't Ex. C at 9.) The prosecutor responded to the argument that there was no evidence of a "sadistic purpose" by arguing that the wounds inflicted on Woods, in particular to his rectum, by their nature showed that the perpetrators intended "something more" than simply to kill him, i.e. a sadistic purpose. (<u>Id.</u>) As to the charge that there was no evidence of motive, the prosecutor argued that sometimes people act with no other motive than "enjoying in some sick way the suffering

United States District Court
For the Northern District of California

of a human being." (Id.)  The three notorious crimes that the prosecutor cited were examples that illustrated the prosecutor's points insofar as they were killings in which the very nature of the wounds inflicted and the actions of the perpetrators displayed a sadistic purpose and a "sick" motive.  As such, the prosecutor cited the other crimes to illustrate how the evidence of Petitioner's actions and Woods's wounds in and of themselves can establish his "sadistic" purpose and motive.

The prosecutor's comments, even if they were improper, did not rise to the level of a due process violation.  Factors considered in determining whether improper comments rise to the level of due process violation are (1) the weight of evidence of guilt, see Young, 470 U.S. at 19; (2) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct related to a critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972); and (4) whether a prosecutor's comment misstated or manipulated the evidence, see Darden, 477 U.S. at 182.

The evidence of guilt was very strong in this case.  It was not disputed that Petitioner had stomped on Woods's head several times while Woods lay motionless on the ground surrounded by five assailants who had already been beating him.  Petitioner had also confessed to forcing a metal object into the victim's anus.  As discussed above, the defense that Petitioner's actions lacked malice or implied malice because he acted in the heat of passion or in imperfect self-defense was very weak.  In addition, the prosecutor's comments were relatively isolated in that they occurred only during rebuttal argument and the prosecutor had not

United States District Court
For the Northern District of California

drawn comparisons to other crimes at any other point in the trial. Lastly, although the comments did relate to a central issue of Petitioner's mental state, they did not misstate or manipulate any of the evidence showing what Petitioner did to Woods.

Petitioner points to the fact that the jurors indicated during the prosecutor's case-in-chief that they were upset and disturbed by the evidence. (RT at 1178-86.) This occurred long before the prosecutor's comments, however, and there is no indication or evidence that the jury had been upset by those comments; rather the jury indicated that they were upset by the evidence of the crimes committed against Woods.

In sum, in the context of a strong case against Petitioner, the prosecutor's relatively isolated comments that did not misstate the evidence and were responsive to defense counsel's argument did not rise to the level of a due process violation.[3]

In his third claim, Petitioner argues that counsel was ineffective in failing to object to the prosecutor's references to the other crimes. (Amend Pet. at 16.) A claim of ineffective assistance of counsel is cognizable as a claim of the denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under

---

[3]In light of this conclusion, the Court need not reach Respondent's alternative argument that a portion of this claim is procedurally defaulted.

United States District Court
For the Northern District of California

1  prevailing professional norms.  Id. at 687-88.  A petitioner must

2  also establish that he was prejudiced, i.e., that "there is a

3  reasonable probability that, but for counsel's unprofessional

4  errors, the result of the proceeding would have been different."

5  Id. at 694.

6      Petitioner argues that when counsel objected after the

7  prosecutor's comments about the Wyoming crime, he should have made

8  it clear that he was also objecting to the earlier comments about

9  the New York and Texas crimes; that counsel should have moved for a

10 mistrial based on the prosecutor's comments; and that if such a

11 motion failed, he should have moved to voir dire the jurors about

12 the prosecutor's comments.  Petitioner's counsel may have initially

13 chosen not to object, and chosen not to seek a curative instruction

14 or voir dire, for the tactical reason of not calling further

15 attention to the comments.  Petitioner was not prejudiced by

16 counsel's failure to object to the earlier comments or make the

17 motions Petitioner suggests because, as discussed above, the

18 comments were relatively isolated and not misleading, and, as such,

19 they were unlikely to have made any difference in the outcome of a

20 trial in which the evidence against Petitioner was strong.

21      Accordingly, the state court's rejection of Petitioner's

22 claims of prosecutorial misconduct and ineffective assistance of

23 counsel as to the prosecutor's rebuttal argument was neither

24 contrary to nor an unreasonable application of federal law.

25 Petitioner is not entitled to habeas relief on these claims.

26 III. SUFFICIENCY OF EVIDENCE OF TORTURE

27      In his fourth claim, Petitioner argues that he received

28 ineffective assistance of counsel at trial and on appeal because

neither attorney challenged the sufficiency of the evidence of torture. (Amend. Pet. at 18.) Petitioner claims that trial counsel should have moved to dismiss the torture charge at the close of the prosecutor's case for insufficient evidence, and that appellate counsel should have argued on appeal that the conviction was not supported by sufficient evidence.

Petitioner's claim turns on whether there is any merit to the argument that there was insufficient evidence of torture. Trial counsel does not perform deficiently in failing to file a meritless motion, Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005), nor does a defendant suffer prejudice if there is no reasonable likelihood that the motion would have been granted, Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999). Similarly, a claim that appellate counsel was ineffective for failing to raise a claim on appeal requires showing that it was objectively unreasonable not to raise the claim and that there is a reasonable probability that if counsel had raised the claim, the appeal would have succeeded. Miller v. Keeney, 882 F.2d 1428, 1433-34, nn.9-10 (9th Cir. 1989).

There was sufficient evidence to sustain a conviction of torture in this case. A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a claim for the violation of due process. Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979). A reviewing court does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). The court "determines only whether, 'after viewing the evidence in the

United States District Court
For the Northern District of California

light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson, 443 U.S. at 319). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).

Under California law, torture has two elements: (1) the infliction of great bodily injury on another; and (2) the specific intent to cause cruel or extreme pain and suffering for revenge, extortion or persuasion or any sadistic purpose. Cal. Pen. Code § 206; People v. Burton, 143 Cal. App. 4th 447, 452 (2006). The jury was instructed on these elements. (CT at 1219.) The jury was also instructed on the definition of great bodily injury as follows:[4]

> It is alleged in count 2 that in the commission or attempted commission of the crime therein described the defendant [] personally inflicted great bodily injury on Seth Woods which caused him to become comatose due to a brain injury. If you find a defendant guilty of torture, you must determine whether that defendant personally inflicted great bodily injury on Seth Woods in the commission or attempted commission of torture. "Great bodily injury," as used in this instruction, means a significant or substantial physical injury. Moreover, trivial or moderate injuries do not constitute great bodily injury. When a person participates in a group

---

[4]This instruction defined the term "great bodily injury" in Cal. Pen. Code § 12022.7, which is also the definition of "great bodily injury" in the torture statute. See Cal. Pen. Code § 206 (prohibiting the infliction of "great bodily injury as defined in [Cal. Pen. Code] Section 12022.7").

United States District Court
For the Northern District of California

beating and it is not possible to determine which assailant inflicted a particular injury, he or she may be found to have personally inflicted great bodily injury upon the victim if (1) the application of unlawful physical force upon the victim was of such a nature that, by itself, it could have caused the great bodily injury suffered by the victim; or (2) that at the time the defendant personally applied unlawful physical force to the victim, the defendant knew that other persons, as part of the same incident, had applied, were applying, or would apply unlawful physical force upon the victim and the defendant then knew, or reasonably should have known, that the cumulative effect of all the unlawful force would result in great bodily injury.

(CT at 1232.)

Petitioner argues that there was insufficient evidence to satisfy the great bodily injury element of the torture charge.[5]  He argues that the injuries to the Woods's anus were not sufficient because the medical examiner testified that the lacerations were small and shallow, not penetrating farther than the top layers of the skin, and no longer than one-half inch.  (RT at 976-81, 103-07.)  In addition, the jury found the allegation of great bodily injury as to the sexual penetration count not to be true.  (CT at 1233, 1249.)  Petitioner also argues that there was insufficient evidence of great bodily injury because he and the other assailants "only punched and kicked" Woods, and the duration of Petitioner's assault was estimated at fifteen seconds.

There was certainly ample evidence of great bodily injury as to Woods's head.  Petitioner testified to stomping on Woods's head three or four times while he lay motionless on the concrete, after Petitioner had seen the other assailants kick and punch him.  This testimony was corroborated by his prior statements to the police,

---

[5]The trial court struck the sentence enhancement for great bodily injury on the torture charge.

United States District Court
For the Northern District of California

as well as statements by the other assailants.  In addition, the examining physician testified that Woods had swelling around the entire skull, significant abrasions on his face, a "really significant degree of mutilation to the ear," "some form of spinal cord injury," and had been rendered comatose with no chance of recovering brain function.  (RT at 749-833.)  In addition, both the examining physician and the medical examiner found that the brain and other head injuries were consistent with stomping or kicking to Woods's head.  (RT at 812-15, 832-33, 981-82.)

In light of this evidence of extensive injuries to Woods's head, and the evidence that they were caused by the number and severity of the punches and kicks Petitioner and his cohorts inflicted, the jury could rationally find beyond a reasonable doubt that the element of great bodily injury in the torture charge had been met.

Petitioner also argues that there was insufficient evidence that he intended that Woods suffer "cruel or extreme pain," as required by California Penal Code section 206.  He argues that there was no evidence that Woods cried out or begged for them to stop, there was no medical evidence as to the amount of pain Woods experienced, and that it "is common knowledge" that the blows that knocked Petitioner out were "anesthetic" and prevented Petitioner from feeling pain.  (Amend. Pet. at 19.)  It is clear, however, that a jury could find no reasonable doubt that Petitioner intended to cause Woods to suffer cruel or extreme pain from the evidence that Petitioner stomped on Woods's head three to four times while Woods lay on the concrete ground, and subsequently either forced a metal object into Woods's anus or struck Woods's buttocks with a

25

metal stick.

Because a claim that the torture conviction was not supported by sufficient evidence did not have any reasonable chance of success, trial and appellate counsel acted reasonably in failing to raise such a claim, and Petitioner was not prejudiced thereby. Accordingly, the state court's rejection of this claim was neither contrary to nor an unreasonable application of federal law, and Petitioner is not entitled to habeas relief on this claim.

IV.   INVOLUNTARY MANSLAUGHTER INSTRUCTION

In his fifth claim, Petitioner argues that his right to due process was violated by an error in the involuntary manslaughter instruction.   (Amend. Pet. at 21.)

The following involuntary manslaughter instruction, pursuant to CALJIC No. 8.45, was read:

> Every person who unlawfully kills a human being without malice aforethought and without an intent to kill is guilty of the crime of involuntary manslaughter in violation of Penal Code section 192, subdivision (b).
>
> A killing is unlawful within the meaning of this instruction if it occurred:
> 1.   During the commission of an unlawful act not amounting to a felony, which is dangerous to human life under the circumstances of its commission; or
> 2.   In the commission of an act, ordinarily lawful, which involves a high degree of risk of death or great bodily harm, without due caution and circumspection.
>
> An "unlawful act" consists of a violation of Penal Code section 245(a)(1)(assault by means of force likely to produce great bodily injury or with a deadly weapon).
>
> The commission of an unlawful act, without due caution and circumspection, would necessarily be an act that was dangerous to human life in its commission.
>
> In order to prove this crime, each of the following elements must be proved:
> 1.   A human being was killed; and

**United States District Court**
For the Northern District of California

1          2.   The killing was unlawful.

2  (CT at 1204.)

3       Petitioner argues that the instruction was erroneous in

4  stating that involuntary manslaughter involves a killing during "an

5  unlawful act not amounting to a felony."  (Amend. Pet. At 21.)

6  According to Petitioner this language "foreclosed a finding of

7  involuntary manslaughter based upon the commission of an assault

8  with force likely to produce great bodily injury where intent to

9  kill and malice were lacking."  (Id.)

10      As discussed above, a petitioner must show that an erroneous

11  instruction so infected the entire trial that the resulting

12  conviction violates due process.  Estelle, 502 U.S. at 72.  The

13  instruction is judged in the context of the instructions as a whole

14  and the trial record and, if it is faulty, the court inquires

15  whether there is a "reasonable likelihood" that the jury has

16  applied the challenged instruction in a way that violates the

17  Constitution.  Id. at 72 & n.4.

18      There is no reasonable likelihood that the jury would read the

19  instruction to prohibit a finding of involuntary manslaughter where

20  Petitioner killed Woods during the commission of an assault by

21  means of force likely to produce great bodily injury, but did so

22  without malice or intent to kill.  To begin with, the first

23  sentence of the instruction stated that involuntary manslaughter is

24  an unlawful killing done "without malice aforethought and without

25  an intent to kill."  (CT at 1204.)  The instruction went on to

26  define an unlawful killing as including a killing "during the

27  commission of an unlawful act not amounting to a felony."  (Id.)

28  Petitioner argues that the jury would interpret this to mean that

United States District Court
For the Northern District of California

an involuntary manslaughter could not occur during the commission of an assault with force likely to produce great bodily injury because the "average citizen would surmise" that such an assault is a felony. (Amend. Pet. at 22.) The instruction foreclosed such an interpretation, however, because it explicitly stated that "an 'unlawful act' consists of violation of Penal Code sections 245(a)(1) (assault by means of force likely to produce great bodily injury)." Thus, even if any jurors surmised that assault is a felony, there is no reasonable likelihood that they would think that assault did not qualify as an "unlawful act" for purposes of involuntary manslaughter because the instruction explicitly informed them that assault is precisely such an act. Consequently, there is no reasonable likelihood that the jury would have understood the instruction in the erroneous manner Petitioner suggests, and the instruction did not violate his right to due process.

Even if the instruction were erroneous, moreover, any such error was not prejudicial. A jury instruction that misdescribes an element of an offense is not prejudicial if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. As discussed above in Part I, the jury's second-degree murder verdict indicated that it found that Petitioner did kill with malice and the intent to kill. Having made such a finding, an involuntary manslaughter verdict was foreclosed even if the involuntary manslaughter instruction had not included the language to which Petitioner objects. Consequently, the instruction, even if it had been erroneous, was not prejudicial under Brecht.

United States District Court
For the Northern District of California

Petitioner also argues in his fifth claim that the faulty involuntary manslaughter instruction violated his right to a trial by jury, as well as his right to due process.  (Amend Pet. at 20.) Petitioner does not explain how these rights were violated by the instruction.  (Id. at 20-21.)  In any event, any claim based on the right to a jury fails because, as discussed above, there was no error in the instruction, and even had there been error, such error was not prejudicial.

In his sixth claim, Petitioner argues that counsel was ineffective in failing to object to the involuntary manslaughter instruction on the grounds raised by Petitioner, above.  (Amend Pet. at 22.)  Because any error in the involuntary manslaughter instruction was not prejudicial under Brecht, for the reasons discussed above, the failure to object to it was not prejudicial under Strickland.  Accordingly, this claim of ineffective assistance of counsel fails.

The state court's denial of Petitioner's claims that the involuntary manslaughter instruction was erroneous and that counsel was ineffective in failing to object to it was neither contrary to nor an unreasonable application of federal law.  Petitioner is not entitled to habeas relief on these claims.

V.   AIDER AND ABETTOR LIABILITY INSTRUCTIONS

Petitioner claims that the jury instructions violated his right to due process because they misstated aider and abettor liability for second-degree murder.[6]  (Amend. Pet. at 23-25.)

---

[6]This is the eighth claim in the amended petition.  (Amend. Pet. at 25.)  His seventh claim, addressed below, is that counsel was ineffective in failing to object to the jury instructions
(continued...)

United States District Court
For the Northern District of California

Petitioner contends that the instructions on aiding and abetting, (CT at 1165-66), when read in combination with the instructions on murder (CT at 1191) and malice (CT at 1192), allowed the jury to find him guilty of second-degree murder based upon a theory of aiding and abetting a murder that the principal committed with only implied malice.  (Amend. Pet. at 24.)  He claims that such a theory is not allowed by California law.  (Id. at 23-24.)

Petitioner's understanding of state law is wrong.  Petitioner cites People v. Patterson, 209 Cal. App. 3d 610, 614-15 (1989), for the proposition that an aider and abettor cannot be liable for second-degree murder unless the perpetrator acted with express malice.  Patterson contains no such holding.  Patterson addressed attempted murder, not murder; it held that the failure to instruct that attempted murder requires express malice and that there is no crime of attempted felony murder constitutes error.  Id. at 614-15.  Contrary to Petitioner's assertion, California does in fact allow a defendant to be convicted of aiding and abetting a second-degree murder that the principal committed with implied malice.  See People v. Gonzales, 4 Cal. App. 3d 593, 602 (1970) (finding that implied malice instruction for second-degree murder may be applied to aider and abettor as well as to principal).  Consequently, Petitioner's interpretation of state law, which is the premise of his claim that the aiding and abetting instructions were erroneous, is without merit.

Petitioner also argues that the instructions improperly

---

[6](...continued)

regarding aider and abettor liability on the same grounds that he claims they were invalid.  (Amend. Pet. at 23.)

United States District Court
For the Northern District of California

1 prohibited the jury from finding that an aider and abettor could be

2 less culpable than the actual perpetrator.  The jury did not

3 receive any such instruction, however.  (See CT at 1136-1243.)

4 Compare People v. Woods, 8 Cal. App. 4th 1570, 1579-80

5 (1992)(finding error because trial court explicitly instructed jury

6 not to find aiders and abettors guilty of lesser crime than

7 perpetrator).  Petitioner does not cite anything in the

8 instructions prohibiting the jury from finding an aider and abettor

9 less culpable than the killer.  Rather, he bases his argument on

10 the fact that the prosecutor argued that if Petitioner was an aider

11 and abettor, he was just as culpable as the killer.  (Amend Pet. at

12 24.)  Such argument by the prosecutor does not amount to

13 instructional error by the trial court, however:

> [A]rguments of counsel generally carry less weight with a
> jury than do instructions from the court.  The former are
> not evidence, and are likely viewed as the statements of
> advocates; the latter, we have often recognized, are
> viewed as definitive and binding statements of the law.

17 Boyde v. California, 494 U.S. 370, 384-85 (1989) (citations

18 omitted).  The jury was explicitly instructed that argument by

19 counsel is not a statement of the law.  (CT at 1137.)  The record

20 does not support Petitioner's contention that the jury was

21 erroneously instructed that an aider and abettor to the killing

22 could not be found less culpable than the killer.

23    For the foregoing reasons, Petitioner's claim that the

24 instructions regarding aiding and abetting liability were erroneous

25 and violated his right to due process fails.  Because there was no

26 error in these instructions, Petitioner's claim that they violated

27 his right to a trial by jury also fails (Amend. Pet. at 25), as

28 does his claim that counsel was ineffective in failing to object to

31

**United States District Court**
For the Northern District of California

1  them (Amend. Pet. at 23).  Consequently, the state court's denial

2  of these claims was neither contrary to nor an unreasonable

3  application of federal law, and Petitioner is not entitled to

4  habeas relief on these claims.

5  VI.   CUMULATIVE ERROR

6      In his ninth claim, Petitioner contends that the cumulative

7  effects of the errors asserted in claims three through eight,

8  discussed above, caused a violation of his rights to due process, a

9  jury trial and the effective assistance of counsel.

10     Petitioner cites no Supreme Court precedent, and the Court is

11 aware of none, providing that the cumulative effect of multiple

12 alleged errors may violate a defendant's due process right to a

13 fair trial, his right to a jury trial, or his right to the

14 effective assistance of counsel.  As discussed above, 28 U.S.C.

15 § 2254(d)(1) mandates that habeas relief may be granted only if the

16 state courts have acted contrary to or have unreasonably applied

17 federal law as determined by the United States Supreme Court.

18 Williams, 529 U.S. at 412 ("Section 2254(d)(1) restricts the source

19 of clearly established law to [the Supreme] Court's

20 jurisprudence.").  Consequently, in the absence of Supreme Court

21 precedent recognizing a claim of "cumulative error," habeas relief

22 cannot be granted on such theory.

23     In any event, for the reasons discussed above, the Court has

24 found no constitutional error exists based on claims three through

25 eight, let alone multiple errors.  Because there have been no

26 errors to accumulate, there can be no constitutional violation

27 based on a theory of "cumulative" error.  See Mancuso v. Olivarez,

28 292 F.3d 939, 957 (9th Cir. 2002) (holding where there are no

32

1    errors, there can be no cumulative error).  Consequently,

2    Petitioner's claim, even if it were based on United States Supreme

3    Court precedent, would fail.

4        Accordingly, Petitioner is not entitled to habeas relief on

5    this claim.

6                              CONCLUSION

7        The petition for a writ of habeas corpus is DENIED.

8        No certificate of appealability is warranted in this case.

9    See Rule 11(a) of the Rules Governing § 2254 Cases, 28 U.S.C. foll.

10   § 2254 (requiring district court to rule on certificate of

11   appealability in same order that denies petition).  Petitioner has

12   failed to make a substantial showing that any of his claims

13   amounted to a denial of his constitutional rights or demonstrate

14   that a reasonable jurist would find this Court's denial of his

15   claims debatable or wrong.  See Slack v. McDaniel, 529 U.S. 473,

16   484 (2000).

17       The clerk shall enter judgment and close the file.  All

18   pending motions are terminated.

19       IT IS SO ORDERED.

20   DATED: 2/16/10

                                       _____
21                                     CLAUDIA WILKEN
                                       United States District Judge

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

MOEVAO,

                  Plaintiff,

  v.

WOODFORD et al,

                  Defendant.
_____/

Case Number: CV05-02125 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on February 16, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Failautusi  Moevao T-08134
Correctional Training Facility
RA-235
P.O. Box 705
Soledad,  CA 93960

Dated: February 16, 2010

Richard W. Wieking, Clerk
By: Sheilah Cahill, Deputy Clerk

United States District Court
For the Northern District of California